UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GILANE POPANDA,
*Individually and as Successor to the Estate of Dale Popanda,*
and DEANNDRA SCHMOCKER,
*Special Administrator of the Estate of Dominique A. Roth,*

        Plaintiffs,

                      Case No. 20-cv-982-pp

  v.

ADAM ROTH,

        Defendant.

---

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 78) AND ORDERING CLERK OF COURT TO RELEASE INSURANCE PROCEEDS TO PLAINTIFFS**

---

Prudential Insurance Company of America Life Insurance filed an interpleader complaint seeking guidance as to whether defendant Adam Roth, who has been convicted of killing his wife and sister-in-law, could recover the proceeds from his wife's life insurance policy. Dkt. No. 1. The defendant pled guilty to all counts in his criminal case, which included the count charging him with first-degree, intentional homicide. The Waukesha County Circuit Court held a bifurcated proceeding; at the responsibility phase, the state court withheld entry of the judgment of guilt and found the defendant not guilty by reason of mental disease or defect. See Wis. Stat. §971.165(1)(d). The estate of Dominique Roth (the defendant's wife) and the estate of her father have filed a motion for summary judgment, claiming entitlement to the life insurance

1

proceeds based on (1) the defendant's guilty pleas in the first phase of the criminal proceedings and (2) a ruling in the Waukesha County Circuit Court wrongful death case that the defendant "caused" Dominique Roth's death.

Nearly all states, including Wisconsin, have adopted "slayer statutes" that prohibit a killer from profiting from his wrongdoing. Under Wisconsin's Slayer Statute, "[a] final adjudication of delinquency on the basis of an unlawful and intentional killing of the decedent conclusively establishes the adjudicated individual as the decedent's killer for purposes" of the statute. Wis. Stat. §854.14(5)(b). Wisconsin courts have not addressed whether someone who kills but later is determined to be found not guilty to reason of mental disease or defect can receive proceeds as a beneficiary under its slayer statute. Based on the undisputed facts in the record, the history of the statute and relevant case law, the court finds that Wisconsin's slayer statute prohibits the defendant from recovering in this federal case.

The court will enter judgment awarding the life insurance proceeds to the plaintiffs.

## I.   Plaintiffs' Motion for Summary Judgment

### A.   Findings of Fact

As required by this court's Civil Local Rule 56(b)(1)(C), the plaintiffs filed a statement of proposed material facts. Dkt. No. 80. The defendant (who is representing himself)[1] responded to those findings; for most the plaintiffs'

_____

[1] At a status conference on February 22, 2022, the defendant advised the court that he'd tried to hire a lawyer but could not afford one. Dkt. No. 57 at 1. The court offered to provide him with a list of organizations that provide legal

2

proposed facts, the defendant either denied the proposed fact, claimed a lack of knowledge regarding the proposed fact or objected to the proposed fact as irrelevant. Dkt. No. 89. The defendant did not file any proposed facts of his own.

This court's Civil Local Rule 56(b)(2)(B) requires a person opposing a motion for summary judgment to file:

> **(B)** a concise response to the moving party's statement of facts that must contain:
>
> > **(i)** A reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon . . . .

The defendant did not comply with this rule. His responses are concise; they are so concise that regarding the proposed facts with which he disagrees, the plaintiff did not include citations to affidavits, declarations

---

counsel at reduced or no cost; the defendant accepted the court's officer. Id. On February 25, 2022, the court mailed the defendant a list of such organizations. Dkt. No. 56. On April 6, 2022, the court received a letter from the defendant's father, stating that they were "still actively looking for an attorney or law firm" and were hopeful that they would find counsel. Dkt. No. 58. On May 2, 2022, the court receive another letter from the defendant's father, in which he stated that the defendant had found a lawyer for the limited purpose of settlement, but when no settlement could be reached, the lawyer had withdrawn. Dkt. No. 62. At another status conference on October 3, 2024, the defendant advised the court that he still had not found a lawyer and that he was continuing to look for one. Dkt. No. 76 at 1. In a request for an extension of time filed December 16, 2024, the defendant advised the court that he still was searching for representation and that he'd been reaching out to various non-profits and organizations that he thought could help. Dkt. No. 85 at 2. It has been over five years since the defendant answered the original complaint; in that time, he and his family have not found counsel to represent him.

3

or other supporting materials upon which he bases those disagreements. For example, he states for the plaintiffs' proposed findings ##4-15, "Deny—relevance to this case." Dkt. No. 89 at 1-2. He does the same for the plaintiffs' proposed findings ##36 through 64. These responses are not sufficient to allow the court to treat those proposed findings of fact as controverted, and it deems them admitted for the purpose of summary judgment.

Of the plaintiffs' sixty-seven proposed findings of fact, the defendant admitted only six. The court's recitation of the facts identifies the facts the plaintiff has admitted.

      1.    *Criminal Charges*

On March 10, 2020, a Waukesha County Sheriff's Deputy responded to a 911 call in the Town of Waukesha. Dkt. No. 80 at ¶1.[2] The 911 dispatcher heard a female screaming and a male yelling into the phone. Id. at ¶2. When the deputy arrived, he encountered Desiree Popanda (later identified as a sister of the defendant's wife, Dominique Roth) at the end of the driveway and she was "bleeding profusely" and "covered in blood." Id. at ¶3.

As he walked along the driveway, the deputy saw Gilane Popanda—the defendant's mother-in-law (Dominique's mother) leaning against a truck, covered in blood; she told the deputy, "He's stabbing them inside." Id. at ¶4. As the deputy entered the house, he observed "a large amount of blood on the staircase and hallway." Id. at ¶5. He heard a female shrieking and screaming

---

[2] The plaintiff admits this fact. Dkt. No. 89 at ¶1.

upstairs. <u>Id.</u> at ¶6. The deputy observed the defendant covered in blood, with a large knife in his left hand. <u>Id.</u> at ¶7. The defendant dropped the knife, and said, "All right, I am done now." <u>Id.</u> at ¶8.

Another deputy arrived, and as they made their way upstairs, they noticed the lifeless body of Deidre Popanda (another of Dominique's sisters) surrounded by a pool of blood. <u>Id.</u> at ¶9. They also observed Dominique lying on the ground covered in blood and suffering from several stab wounds, including puncture wounds to her neck and chest. <u>Id.</u> at ¶10. Efforts to revive Dominque were unsuccessful, and she died shortly thereafter. <u>Id.</u> at ¶11. Gilane observed the defendant stabbing Dominique and Deidre. <u>Id.</u> at ¶12. She also offered an account of the defendant's attacks on her. <u>Id.</u> at ¶13.

The defendant also tried to attack Gilane's nine-year-old grandson, but the child was able to escape out of the home with the help of Gilane, Dominique and Desiree. <u>Id.</u> at ¶14. As the defendant was being taken into custody, he uttered, "I did it, I killed them." Subsequently, at Waukesha Memorial Hospital where he was receiving treatment after the incident, the defendant remarked, unprompted:

> I killed my dog. He made the cutest little sound when I slit his throat. Then I killed my wife, I stabbed her in the back and I slit her throat. I think I cut her ear off too. I then busted through the door, I tried to get the kid but the kid got away from me and ran, that little fucker.

<u>Id.</u> at ¶15.

The defendant was charged in Waukesha County Circuit Court with the following six felony counts on April 8, 2020:

|            |                                                                      |
|------------|----------------------------------------------------------------------|
| Count 1:   | First Degree Intentional Homicide, Use of a Dangerous Weapon          |
| Count 2:   | First Degree Intentional Homicide, Use of a Dangerous Weapon          |
| Count 3:   | Attempted First Degree Intentional Homicide, Use of a Dangerous Weapon |
| Count 4:   | Attempted First Degree Intentional Homicide, Use of a Dangerous Weapon |
| Count 5:   | First Degree Reckless Endangering Safety, Use of a Dangerous Weapon    |
| Count 6:   | Mistreatment of Animals, Use of a Dangerous Weapon                    |

Id. at ¶16.[3]

On November 13, 2020, the defendant waived his right to a bifurcated trial and pled guilty but not guilty due to mental disease or defect (NGI) to the first-degree intentional homicide and the attempted first-degree intentional homicide charges. Id. at ¶17. At the plea hearing, he pled guilty to Counts 1 through 4 (the homicide and attempted homicide counts). Id. at ¶18. As part of the plea colloquy, the defendant admitted that he caused the deaths of Dominique and Deidre, and that he attempted to cause the deaths of Gilane and Desiree. Id. at ¶19. The State of Wisconsin offered, and the defendant accepted, the state-court complaint as the factual basis for the plea. Id. at ¶20. The presiding judge found that "a factual basis exists for the pleas and that [the defendant] has committed the crimes charged." Id. at ¶21. The court found the defendant guilty of Counts 1 through 4 and dismissed but read in Counts 5 and 6. Id. at ¶¶22. The court subsequently determined the defendant not guilty by reason of mental disease or defect. Id. at ¶23.[4]

_____

[3] The defendant admits this fact. Dkt. No. 89 at ¶16.
[4] The defendant admits this fact. Dkt. No. 89 at ¶23.

On December 14, 2020, the judge ordered the defendant committed for life on each of the intentional homicide charges and sixty years on each of the attempted first-degree intentional homicide charges. Id. at ¶24. The state court entered a judgment of not guilty by reason of mental disease or defect, and the defendant was committed to the Department of Health Services for life. Id. at ¶25.[5]

### 2. *Federal Interpleader*

On June 30, 2020, Prudential Insurance Company of America filed an interpleader complaint asking the court to allow it to deposit the proceeds of Dominque Roth's life insurance policy with the court, and asking the court to either require the parties to settle among themselves to whom those proceeds should be paid or make that determination itself. Dkt. No. 1. The interpleader complaint alleged that Dominique's employer had provided her life insurance coverage under a group policy, and that she had designated the defendant as the sole, primary beneficiary with no contingent beneficiary. Id. at ¶11. Prudential asked the court to determine whether the defendant was precluded from receiving benefits under Wis. Stat. ¶854.14, the "Wisconsin Slayer Statute." Id. at ¶¶14-16.

The court granted the joint motion for interpleader relief, ordered Prudential to deposit the remaining insurance proceeds ($74,992.77 plus interest) with the Clerk of Court and dismissed Prudential. Dkt. No. 30. Gilane, individually and as the successor to the estate of Dominique's father (Dale

---

[5] The defendant admits this fact. Dkt. No. 89 at ¶25.

Popanda, who passed away a few months after Prudential filed this lawsuit, dkt. no. 35 at 1), and Deandra Schmocker (another of Dominique's sisters, id. at ¶1) as the special administrator of Dominique's estate, filed a realigned complaint that included claims for wrongful death, a survival claim and a claim of intentional infliction of emotional distress against the defendant. Dkt. No. 35. Gilane, as the special administrator of her daughter Deidre's estate, and Desiree filed a motion to intervene with claims of wrongful death, survival claims and intentional infliction of emotional distress claims against the defendant. Dkt. No. 37 at ¶38.

On November 12, 2021, the plaintiffs filed a motion for partial summary judgment, dkt. no. 48, but the court struck the realigned complaint (Dkt. No. 35) on procedural grounds, dkt. no. 54. The court denied Gilane and Desiree's motion to intervene. Id. The court issued a stay and administratively closed the case while the plaintiffs (Gilane and Deandra) pursued in their state law claims in Waukesha County Circuit Court; the court also dismissed without prejudice the plaintiffs' pending motion for partial summary judgment. Dkt. No. 64.

3.    *Waukesha County Circuit Court*

On February 25, 2022, Gilane (individually, as successor to the estate of her late husband Dale Popanda and as special administrator of the estate of her daughter Deidre Popanda), Deanndra Schmocker (individually and as special administrator of the estate of her sister Dominique A. Roth) and Desiree Popanda initiated a wrongful death suit against the defendant in Waukesha County Case No. 2022-CV-289. Dkt. No. 80 at ¶26. On May 9, 2022, the

8

plaintiffs filed a motion for partial summary judgment in that case on the issue of liability, arguing that the defendant's actions in attacking Dominique—along with his subsequent plea of "guilty but not guilty due to mental disease or defect" and the conviction of "not guilty by reason of mental disease or defect"—established that as a matter of law, he had caused Dominique's death. Id. at ¶27

On August 29, 2022, the Waukesha County Circuit Court granted partial summary judgment in favor of the plaintiffs on liability, finding that "[the defendant] caused the deaths of Dominique Roth and Deidre Popanda and that he caused the injuries to Gilane Popanda and Desiree Popanda." Id. at ¶28. The state court held that because of that ruling, the only issues remaining for trial were the questions of damages. Id. at ¶29.

On May 16, 2023, a bench trial took place in Waukesha County Circuit Court before Judge Michale J. Aprahamian. Id. at ¶30; Dkt. No. 81-14.[6] The judge heard the testimony of Desiree, Gilane, Deanndra and Destinee Miller (another of Dominique's sisters). Dkt. No. 80 at ¶31; Dkt. No. 81-14 at 86. Desiree and Gilane testified in detail about their experiences on March 10, 2020, and the physical and emotional injuries they suffered from the defendant's actions. Dkt. No. 80 at ¶32. Desiree explained that, on March 10, 2020, she lived in her parents' home with her mom, dad, Deidre, Dominique

---

[6] The defendant admits this fact. Dkt. No. 89 at ¶30.

and the defendant. Id. at ¶35.[7] Desiree testified that after 4:30 p.m. on March

10, 2020, she began to hear Dominique screaming:

> . . . What I initially the first scream I thought it was, I thought it was just something like she almost like she saw a centipede or a bug. It was just a simple scream like that. But then the scream was worse than like it got worse where I realized it was more. She was more in terror.

> I then came running up the stairs at same time my mom came running from the living room and that's where we found [the defendant] with a knife attacking her in the kitchen. My mom got into there first to try and grab him and stop him. He turned around and stabbed my mom into her arm or in her arm. When he did that, she then came running out to get, try to get to her phone that was back over on the table next to the couch so she could call for 911.

> [The defendant] went chasing after her and me and Dominique went running after him. I grabbed one of the kitchen chairs. My intention was to try to ram him away from her with the end of the chair and we reached the couch where I ran into [the defendant] with the chair and we both toppled down onto my mom.

> Dominique came in at the same time to start to try to get the knife away from him. I know that [the defendant] had stabbed my mom again while we were all in on the floor fighting with each other and at that time Dominique had or Deidre had come running out of the bathroom. She had been in the shower. She came running out in a towel to try to see what he was going on.

> My mom was screaming her to dial 911. I think they made is [sic] over to us to try to grab the phone from my mom and [the defendant] had been yelling and screaming that they did this to me. I have to do this and he turned and he saw Deidre and he took the knife and shoved it up into her. From what I could see it hit her in the chest area. Then he began, she started to try to run back to the bathroom and he began to follow and chase her into there.

> Me and Dominique then getting up from the floor to chase him after her. Dominique made it into the bathroom before I did and I just heard Deidre screaming and screaming. Then Dominique and [the defendant] were fighting. She was trying to get the knife from him and they were grabbing trying to or coming out of the bathroom.

---

[7] The defendant admits this fact. Dkt. No. 80 at ¶35.

I was trying to find something else to hit [the defendant] with to get her off of him and my mom had pushed another kitchen chair to me and I grabbed it and hit him over the back with it and it burst apart. And he still wasn't stopping and that's when I got on the floor and tried to grab the knife out of his hands while Dominique was also trying to fight him off. And I know he was still stabbing, had been stabbing her while I was trying to get the knife from him.

He had grasped, it was a serrated knife. He had grasped the blade in his hand and I was trying to grab the handle out but his grip was too strong and Dominique had to ask him did you get it and I said no and he pulled it from my hand and stabbed her in the shoulder and that's when I got up to run to get my phone because, which was back downstairs in my bedroom, because it was the only phone I knew where it was so I could start calling 911.

When I got down into my room I heard [the defendant] running down the stairs after me. I closed my door and locked it and that's when he began to throw his body into the door several times until he busted it open.

He got into the room and I had the phone in my hand and I was like please . . . don't do this and he just said, I'm sorry I have to and he went to try to almost hug me and instead took the knife and stabbed me in the back near my kidney. That's when I started to grapple and fight with him and we ended up pushing each other out into the living room area where he against stabbed me[] [a]long my left leg area that tore the knife across and then several areas on my chest were there were small puncture wounds where he was trying to get the knife into me while I was fighting with him.

He had then sliced across my middle finger where it almost cut it halfway off and I don't know if he thought that what he had all done was enough because he suddenly stopped and turned and walked back up the stairs.

When he got to the second flight of stairs almost to the living room area he started yelling where, where is Evan, where is my dog. I grabbed my phone that had fallen during our scuffle. I grabbed my phone up, chased him back up the stairs. During that time I know I had heard my mom yell no. And something, I heard something hit the ground which what I found out she had thrown a heavy ashtray at him which caused him to be distracted I think from going to my son's room.

11

He turned around to go back and right [sic] with my mom. During that time is when I was able to run down the hallway which I had to step, Dominique was laying on the floor just between the bathroom and the hallway and covered in blood. I had looked into the bathroom and saw Deidre rolled over. The towel had fallen off and she was curled over naked and not moving. She wasn't, I couldn't see her breathing. I just kept running to my son's room and I got there.

I opened the door and he actually had a box that he used to hold his toys and he was getting ready to throw it because he saw it was [the defendant] coming in to get him and he dropped it when he, immediately when he saw me and I grabbed his hand and I said come on we have to go and I went running down the hall with him. We made it to the stairs.

I put him in front of me so he could run down the stairs to the front door. My mom immediately came up right behind us and during that time [the defendant] had stopped going after my mom. He went after my parents dog Jack who was laying on the couch and I just heard Jack yelping and then me and my son and my mom made it outside and we were trying to figure out where, where to go and I kept saying towards the driveway just because I wanted to call, to call 911 and I was wanting to get away from the f[r]ont door and my mom and Evan were pointing to the neighbor's house.

So I told Evan to run and he ran over to the neighbor's house who we were good friends with and he went to school with one of their daughters. He was able to get into their house and let them know what was going on. In the meantime my mom and I made it on the driveway and I was trying to open my phone to call 911 and that's when I realized that my, part of my finger was hanging off and my hands were covered in blood so I was having a hard time to getting the screen to work.

I had finally got in 911 on the phone and I was starting to let them know what was happening and [the defendant] was coming outside at that time holding the knife coming after my mom and I and I just told my mom to run. And we made it out to the yard.

I didn't know at the time but she had fallen in the yard next to one of the big planters. I continued to run screaming for help. [The defendant] began to chase me until I had made it into the neighbor's yard. He stopped and looked at me and then turned and walked back into the downstairs patio door to get back into the house. From there I continued on the phone with 911 until I saw a sheriff pull up

12

to, by the houses and I was able to run through the neighbor's yard up their driveway to get to the first sheriff's vehicle to let them know which house it was and what was going on.

Id. at ¶36.

The Waukesha County Circuit Court entered judgment against the defendant in favor of the plaintiffs as follows:

| | |
|---|---|
| First cause of action: | $350,000 |
| Second cause of action: | $2,500,000 |
| Fourth cause of action: | $350,000 |
| Fifth cause of action: | $1,750,000 |
| Seventh cause of action | $500,000 |
| Eighth cause of action: | $500,000 |

Id. at ¶64. The defendant did not appeal. Id. at ¶65. The orders and judgment of the Waukesha County Circuit Court are final. Id. at ¶66.

B.    The Parties' Arguments

1.    *Plaintiffs' Arguments in Support of Summary Judgment* (Dkt. No. 79)

The plaintiffs argue that the undisputed facts in the record allow the court to find that the defendant unlawfully and intentionally killed Dominique Roth and that, as a consequence, he is not entitled to recover as the beneficiary under her life insurance policy. Dkt. No. 79 at 20. According to the plaintiffs, there can be no doubt that the Waukesha County Circuit Court found the defendant acted intentionally. Id. at 21. The plaintiffs rely on the judgment entered in their favor by the Waukesha Circuit Court in the wrongful death action. They cite Wisconsin's wrongful death statute—Wis. Stat. §895.03— asserting that its "exacting nature" mandates the conclusion that the state

13

court found that the defendant intentionally caused Dominique's death. Id.

They recite the language of that statute:

> Whenever the death of a person shall be caused by a wrongful act, neglect or default and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages notwithstanding the death of the person injured; provided, that such action shall be brought for a death caused in this state.

Id. (quoting Wis. Stat. §895.03).

The plaintiffs next explain that Wis. Stat. §895.04(2) "procedurally govern[s]" Wis. Stat. §895.03. Id. They assert that that statute "provides that only one class of relative, ranked in a hierarchy, are entitled to bring wrongful death claims." Id. at 21 (citing Wis. Stat. §895.04(2). They say that if there are no children, the spouse may bring a wrongful death claim. Id. And they explain that if there is no surviving spouse, the right to bring a wrongful death claim "belongs to lineal heirs determined by the intestacy statute, including parents." Id. (citation omitted). The plaintiffs say that if there is a person eligible to make a claim in one class of relatives, a person in a class lower in the hierarchy may not make the claim. Id. at 21-22. The plaintiffs argue that the procedural hierarchy of §895.04(2) generally is "strictly enforced," and they say that "one of the only scenarios in which eligibility to assert a wrongful death claim can skip over a surviving spouse for a subsequent class of relative, is if the surviving spouse feloniously and intentionally killed the decedent." Id. at 22 (citing Steinbarth v. Johannes, 144 Wis.2d 159, 161 (Wis. 1988)). They emphasize that Dominique's parents—Gilane and Dale—asserted the wrongful

14

death claim in Waukesha County, not the defendant. Id. at 23. And they emphasize that the Waukesha County court "allowed the claim of a subsequent class of heir"—a parent, Gilane—"to proceed, given that [the defendant], the surviving spouse, was found to have caused the death," which they assert "establishes that [the defendant's] conduct in causing the death was felonious and intentional." Id. They urge the court to apply Wis. Stat. §854.14(2), (3) and (3m), prohibit the life insurance proceeds from being paid to the defendant and order them distributed to Dominique's estate according to Wisconsin's intestacy statute, Wis. Stat. §852.01. Id.

The plaintiffs also argue that the defendant's NGI plea in the criminal case establishes that the defendant intentionally and unlawfully killed his wife. Id. They explain that in Wisconsin, an NGI plea involves two steps. Id. (citing Wis. Stat. §971.06(1)(d)). First, the defendant must decide whether to enter a "not guilty" plea along with his plea of not guilty by reason of mental disease or defect. Id. If he does so, there is a two-phased trial; the first part determines guilt and the second determines mental responsibility. Id. at 23-24 (citing State v. Burton, 249 Wis.2d 1 (Ct. App. 2013); Wis. Stat. §971.165(1)). But, the plaintiffs argue, if the defendant does not enter a "not guilty" plea along with his NGI plea and there is a substantive basis for finding that he committed the charged crimes, the court finds the defendant guilty and the only issue for trial is mental responsibility. Id. at 24. The plaintiffs emphasize that the defendant "entered the second type of NGI plea, where he admitted to causing all the underlying conduct that led to the deaths of Dominique and Deirdre, and the

injuries to Gilane and Desiree." Id. They emphasize, with extensive quotes from the plea colloquy, that the Waukesha County Circuit Court found the defendant guilty on all four counts. Id. at 24-26. Accordingly, the plaintiffs argue that there is "no material factual dispute that [the defendant] was the cause of the deaths of Dominique and Deidre, or the injuries suffered by Gilane and Desiree." Id. at 26.

2. *Defendant's Arguments in Opposition* (Dkt. No. 88)

The first several pages of the defendant's twenty-two-page opposition brief recount facts. The defendant then says that "because of the rarity of criminal defenses seeking the 'not guilty by reason of mental disease or defect' plea and having it accepted by the court," he asks this court to review the state-court plea transcript and the sentencing/commitment hearing transcript "in their entirety, so that the entire process is presented." Dkt. No. 88 at 3. He asks the court to "consider adopting the considerations, clarifications, context, opinions, findings and conclusions" from those two hearings. Id. at 3. He references the two opinions of the doctors who evaluated him in the state criminal case, emphasizing that the state agreed that the court could make findings from those reports and that the defendant was not guilty by reason of a mental disease or defect. Id. at 4. The defendant quotes the state court judge, who said that the "brain is the most complicated organ in the human body," and who said that people are "ignorant" if they don't believe that the brain could need treatment. Id. at 5.

16

The defendant asserts (or recounts; he may be quoting a transcript) that Wis. Stat. §971.15(1) says that a defendant isn't responsible for criminal conduct if, because of a mental disease or defect, he lacked substantial capacity to appreciate the wrongfulness of his actions or to conform conduct to the law's requirements. Id. at 8. He says that the Wisconsin jury instructions "state that a mental disease or defect is defined broadly as an abnormal condition of the mind which substantially affects mental or emotional processes." Id.

The defendant discusses a report from "Dr. Collins" finding that he lacked the "substantial capacity to appreciate wrongfulness or to conform his conduct to the requirements of the law with respect to the homicide and related charges." Id. at 9 (citing Dkt. No. 91-2 at 23, lines 8-11). The defendant points to the transcript of the responsibility phase of the NGI proceedings, in which he says that the state court judge referenced twelve things that Dr. Collins took into consideration in reaching her opinion. Id. at 10-13 (citing Dkt. No. 81-2 at 23-26). He says that these findings included the defendant's "declining psychiatric stability," evidence that he was "acutely manic and psychotic at the day of the offenses," evidence that his thoughts and sounds were "swirling like a tornado" while talking with his wife, the fact that the 911 caller said that "he has lost his mind, he grabbed a knife, he stabbed my mom, my sister and myself," the fact that police reports corroborated evidence of psychosis and mania, the facts that the defendant made no attempt to "evade detection or responsibility" and made inculpatory statements, the fact that the defendant's

"bizarre comments and erratic behavior" at Waukesha Memorial Hospital triggered a psychiatric evaluation and the fact that he remained psychotic for days after the incident. <u>Id.</u> The defendant recounts the fact that the state court adopted Dr. Collins's findings and accepted the plea of not guilty by reason of mental disease or defect. <u>Id.</u> at 16.

Finally, the defendant quotes language from the commitment hearing showing that he was *committed* to an inpatient psychiatric setting, not incarcerated in a penal institution. <u>Id.</u> at 18-21. He advises the court that he had no criminal record. <u>Id.</u> at 22.

3. *Plaintiffs' Reply* (Dkt. No. 90)

The plaintiffs reply that the defendant failed to comply with the local rules with respect to the proposed findings of fact, and that he failed to address any of the plaintiffs' arguments in support of summary judgment. Dkt. No. 90 at 3. The plaintiffs ask the court to treat the defendant's failure to substantively respond to their summary judgment arguments as concessions. <u>Id.</u> They say that the defendant has failed to make "a cogent argument to explain why summary judgment is inappropriate." <u>Id.</u> They accuse the defendant of merely quoting from two transcripts with no explanation as to how the quoted language would preclude summary judgment. <u>Id.</u> at 4.

## II. Discussion

### A. <u>Summary Judgment Standard</u>

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a

matter of law. Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

      B.    <u>Wis. Stat. §854.14</u>

Wis. Stat. §854.14 governs a property beneficiary who kills a decedent. It states that "the unlawful and intentional killing of the decedent" revokes any provision in a governing instrument (such as an insurance policy, Wis. Stat. §854.01(2)) that, by reason of the decedent's death, transfers property to the killer. Wis. Stat. §854.14(2)(a)1. The statute revokes "every statutory right to which the killer may have been entitled by reason of the decedent's death." Wis. Stat. §854.14(2)(c). In a situation where the killer is otherwise entitled to the proceeds of a life insurance policy on the decedent spouse, the killer's interest is limited to his marital property interest. Wis. Stat. §854.14(3m)(b)1. The statute contains a catch-all provision stating that "a wrongful acquisition

19

of property by a killer not covered by this section shall be treated in accordance with the principle that a killer cannot profit from his or her wrongdoing." Wis. Stat. §854.14(4).

For the statute to apply, the killing must be unlawful and intentional. The statute lists three events that render a killing unlawful and intentional: (1) "a final judgment establishing criminal accountability for the unlawful and intentional killing" that "conclusively establishes the adjudicated individual as the decedent's killer for the purposes" of the statute; (2) "a final adjudication of delinquency on the basis of an unlawful and intentional killing" that "conclusively establishes the adjudicated individual as the decedent's killer for the purposes" of the statute; and (3) "[i]n the absence of a judgment establishing criminal accountability under par. (a) or an adjudication of delinquency under par. (b), the court, upon the petition of an interested person, shall determine whether, based on the preponderance of the evidence, the killing of the decedent was unlawful and intentional for the purposes of" the statute. Wis. Stat. §854.14(5).

There is no final judgment establishing criminal accountability for the unlawful and intentional killing, as referenced under subsection (1); the Waukesha County Circuit Court judge accepted the defendant's plea of not guilty by reason of mental disease or defect and ordered him committed. Nor is there a final adjudication of delinquency as referenced under subsection (2) (the defendant was an adult at the time he killed his wife). That leaves subsection (3), which requires that this federal court must decide, as a matter

20

of law, whether there is a genuine issue of material fact regarding whether the preponderance of the evidence shows that the killing was "unlawful and intentional." And, because the statute does not define "unlawful" or "intentional," the court must decide what those two words mean in the context of the statute. Neither the Seventh Circuit nor the Wisconsin Supreme Court has directly addressed whether a beneficiary who kills the policy owner but is found not guilty by reason of mental disease or defect can act "unlawfully and intentionally" under §854.14.

In 2018, however, the Seventh Circuit was asked to determine whether the Illinois slayer statute—similar in wording to the Wisconsin statute, but not identical—barred a wife's recovery of ERISA pension benefits after she was found not guilty of murdering her husband by reason of insanity. Laborers' Pension Fund v. Miscevic, 880 F.3d 927, 935 (7th Cir. 2018). The Illinois statute prevents a person "who intentionally and unjustifiably causes to the death of another" from receiving property, interest or a benefit by reason of the death. Id. at 934 (citing 755 Ill. Comp. Stat 5/2-6). The Seventh Circuit deferred to the state court's interpretation of the state statute; although the Illinois Supreme Court had not spoken on the issue, in Dougherty v. Cole, 934 N.E.2d 16 (Ill. App. Ct. 2010) an Illinois Appellate Court had. Id. The Dougherty court had examined the statute's history and concluded that where "an individual was insane for criminal purposes but nevertheless cognizant he was killing a person, the Slayer Statute will prevent him from benefitting from his actions." Dougherty, 934 N.E. 2d at 22.

The Seventh Circuit found no reason to believe that the Illinois Supreme Court would disagree:

> Indeed, a textual examination of the Illinois slayer statute and the Illinois insanity statute leads to the same conclusion. The slayer statute applies to bar recovery from any person who "*intentionally* and *unjustifiably* causes the death of another." 755 Ill. Comp. Stat. 5/2-6 (emphases added). And the Illinois insanity statute provides that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, *he lacks substantial capacity to appreciate the criminality of his conduct.*" 720 Ill. Comp. Stat. 5/6-2 (emphasis added). Put simply, an individual may not appreciate the criminality of [his] conduct, but still have "intentionally" and "unjustifiably" caused a death. Indeed, in this case, the judge at Anka's criminal trial made an explicit finding that Anka "intended" to murder Zeljko "without justification," despite concluding Anka was not guilty by reason of insanity.

Laborer's Pension Fund, 880 F.3d at 936. In finding that notwithstanding the insanity defense, the wife intended to kill her husband, the Seventh Circuit emphasized that, in analyzing the slayer statute's intent requirement, the court focuses on civil intent rather than criminal intent. Id.

> ". . . Civil intent only requires showing that a person intended his or her actions; there is no requirement that the person have knowledge that his or her actions were wrongful." *Laborers' Pension Fund v. Miscevic*, No. 1:16-cv-5865, 2017 WL 5904664, at *1 (N.D. Ill. Mar. 24, 2017); *accord Osman v. Osman*, 285 Va. 384, 737 S.E.2d 876, 880 (2013). Here, Anka intentionally stabbed Zeljko in his sleep and intentionally hit Zeljko in the head with a baseball bat to prevent him from calling the police. To be sure, like the killer in *Dougherty*, Anka was unable to appreciate the criminality of her conduct. But also like the killer in *Dougherty*, Anka intended her actions.

Id.

The Seventh Circuit further explained that the insanity defense is an "excuse defense" rather than a "justification defense."

In fact, "insanity and justification are directly at odds." *Id.* at 1641. "Justification . . . suggests praise for persons who are able to see situations clearly and exercise sound judgment under difficult circumstances. Insanity suggests tolerance or empathy for those who cannot see clearly at all." *Id.* at 1642. Put another way, justification defenses, like self-defense, allow "action which society otherwise seeks to prevent [to] become[ ] permissible under the circumstances." *People v. Allegri*, 109 Ill.2d 309, 93 Ill. Dec. 781, 487 N.E.2d 606, 608 (1985). In contrast, excuse defenses, like insanity, "do[ ] not turn unacceptable behavior into permissible conduct, but only excuse[ ] the individual from criminal punishment for having violated a penal statute." *Id.; see also Osman*, 737 S.E.2d at 880–81 ("[A] person who has committed a justifiable homicide is not a person who has committed a 'wrong' . . . . A person who committed an excusable homicide, however, may have committed a wrong in the initial provocation."). Thus, while Anka's killing is excused because she "lack[ed] substantial capacity to appreciate the criminality of [her] conduct," it is not justified. *See* 720 Ill. Comp. Stat. 5/6-2.

Id. at 936-937.

The Seventh Circuit observed that there was the split among states as to "whether the insanity defense to criminal liability also applies as a defense to the application of the slayer statute." Id. at 937 (citing *Boyd v. Boyd*, 149 F.Supp.3d 1331, 1336 (N.D. Ala. 2016) (declining to reach the issue)). The court explained:

On the one hand, several states have determined that a finding of not guilty by reason of insanity negates a bar to inheritance. *See, e.g., In re Armstrong*, 170 So.3d 510, 516 (Miss. 2015) ("Because an insane person lacks the requisite ability to willfully kill another person, the Slayer Statute is not applicable in cases where the killer is determined to be insane at the time of killing."); *In re Vadlamudi's Estate*, 183 N.J. Super. 342, 443 A.2d 1113, 1117 (N.J. Super. Ct. Law Div. 1982) ("[T]he perpetrator of a homicidal act committed while legally insane cannot be, as a matter of law, one 'who intentionally kills' within the meaning of [the New Jersey slayer statute].."); *Simon v. Dibble*, 380 S.W.2d 898, 899 (Tex. Civ. App. 1964) (concluding that an insane person is "not capable of willfully taking [a] life").

23

On the other hand, other state courts have held that their slayer statutes do bar individuals found not guilty by reason of insanity from recovering benefits. *See, e.g., Osman*, 737 S.E.2d at 879–80 (concluding that even though the defendant "avoided criminal sanctions because, due to his mental illness, he did not understand his actions were wrongful," he still "intended his actions"); *In re Estate of Kissinger*, 166 Wash.2d 120, 206 P.3d 665, 671 (2009) (en banc) (holding that the slayer statute applied because "the trial court made very specific findings of fact and conclusions of law and determined that [the individual] acted with premeditated intent").

Id. In the end, the Seventh Circuit determined that what mattered was how the Illinois Supreme Court would interpret the statute; it found that there was no reason to believe that the Illinois Supreme Court would rule differently than the appellate court had. Id.

Wisconsin courts long have held that the law does not permit a killer to profit from the crime. In In re Wilkens' Estate, 192 Wis. 111, 211 N.W. 652, 655-56 (Wis. 1927), the Wisconsin Supreme Court rejected the possibility that a constructive trust existed where a residual beneficiary killed the testator before killing himself. The court wrote:

The equitable doctrine that a man shall not profit by his own wrong dates back centuries in the history of the common law, and is as old as equity itself. It is recognized, as far as we are able to determine, in the laws of all civilized communities. It lies at the foundation of every religious faith, and may be said to be one of the corner stones of the Christian religion. It is vitally essential to the administration of justice, and a careful search of our Statutes fails to reveal that it was ever modified or abrogated. It therefore exists at the present day in Wisconsin, with all the force which it possessed throughout the ages, and this court, in holding as it does in this opinion, does not entrench upon the legislative field, but, on the contrary, its holding is in harmony with the spirit and intent of the Legislature. No system of laws permits a criminal to profit by his own crime, for, if this were so, the very object of all law would be subverted.

24

Id. In 1958, the Wisconsin Supreme Court reversed its holding on the constructive trust theory, but reaffirmed its commitment "to the principle that a murderer will not be permitted to profit by his crime." *In re* Wilson's Will, 5 Wis. 2d 178, 180 (Wis. 1958). In 1981, the Wisconsin legislature took steps to codify that general principle with language added to Wis. Stat. §852.01(2m). See Christopher M. Eisold, *Statute in the Abyss: The Implications of Insanity on Wisconsin's Slayer Statute*, 91 Marq. L. Rev. 875, 880-81 (2008). The Wisconsin legislature enacted Wisconsin's slayer statute in 1997 under a section titled "Beneficiary Who kills Decedent." Id. at 881 (citing Wis. Stat. 854.14).

Two years after the enactment of §854.14, the Wisconsin Court of Appeals was asked to resolve the disposition of a husband's pension after he murdered his wife; the wife's estate claimed an undivided one-half interest in the pension as an estate asset. *In re* Estate of Hackl, 231 Wis. 2d 43 (Wis. Ct. App. 1999). Citing Wis. Stat. §§766.31(3) and 766.62(5), the employee spouse tried to argue that his wife's interest in his pension terminated at her death. Id. at 51. The court explained that these two statutes generally "provide that a nonemployee spouse's interest in his or her spouse's 'deferred employment benefit plan' terminates upon the nonemployee spouse's death." Id. at 581 n.1. The appellate court, applying equitable principles, cited §854.14 as an "indication of the legislature's willingness to foster the public policy embodied in the common law principle that a murderer should not profit from his or her crime." Id.

Against this backdrop, the court considers whether there is a genuine issue of material fact as to whether the preponderance of the evidence shows that the defendant—who undisputedly killed the owner of the policy in question and thus is a "killer" under §854.14—"unlawfully and intentionally" killed his insured spouse. The court first considers the "unlawfully" requirement. The Merriam-Webster Dictionary defines "unlawful" as "illegal," with a secondary definition of "not morally right or conventional." www.merriam-webster.com. The Wisconsin Supreme Court has parsed the word "unlawfully," albeit in the context of an environmental statute that, like §854.14, did not define "unlawful." In State Dept. of Natural Resources v. City of Clintonville, 53 Wis. 2d 1, 6 (Wis. 1971), the Wisconsin high court explained that the word "unlawful,"

> like many words in the English language, is capable of many meanings but acquires a particular meaning for a particular purpose because of the context in which it is used. The word 'unlawfully' need not be a criminal act in a civil action for conspiracy because a wilful violation of a civil right is sufficient for that purpose . . . . The word 'unlawfully' does not always mean knowingly, and may include what is merely unauthorized by law. The word 'unlawful' used in sec. 291.10, Stats., was held to mean only intentional acts of hold-overs . . . An 'unlawful order' of the public service commission, sec. 196.41, Stats., was held to mean one not promulgated according to legislatively created procedures . . . 'Unlawful' in respect to speed in sec. 346.18(1), Stats., the Right of Way Statute, has been defined to mean not only violations of statutes or ordinance but necessarily to include negligence.

Id. (internal citations omitted).

Although the defendant did not directly address the plaintiffs' summary judgment arguments, his focus on the evidence relating to the state-court judge's acceptance of his NGI plea implies that he believes that he could not

26

have acted unlawfully because he was found not guilty by reason of mental disease or defendant. But there is nothing in §854.14(5)(c) to suggest that the word "unlawful" requires a killer to be convicted under a criminal statute. In fact, subsection (c) assumes that there can be an "unlawful and intentional" killing that does not involve a criminal judgment; it says that a killing can be "unlawful and intentional" "[i]n the absence of a judgment establishing criminal liability under par. (a)" if the court decides that the preponderance of the evidence proves that the killing was unlawful and intentional. If the legislature had intended §854.14 to apply only to killers for whom there was a "final judgment establishing criminal accountability for the unlawful and intentional killing of the decedent" that "conclusively establishes the convicted individual as the decedent's killer" for purposes of the statute, it would not have added subsection (c) to the list of ways that an unlawful and intentional killing can be determined.

There is no evidence, and the defendant has not argued, that the defendant's killing of Dominique was authorized by law. The defendant has presented no evidence that he killed Dominique in self-defense, or that he was helping her commit suicide at her request. As the court has explained, the Waukesha County Circuit Court found the defendant liable for the *wrongful* deaths of his wife and her sister. On this record, there is no genuine issue of material fact that the killing of Dominique Roth was unlawful for purposes of §854.14.

27

That leaves the question of whether the defendant's acts were intentional. Wisconsin law says that for the purposes of determining *criminal* intent, a person acts "intentionally" with "purpose to do the thing" or when the person "is aware that his or her conduct is practically certain to cause [a particular] result." Wis. Stat. §939.23. But as the court has explained, when it analyzed the Illinois slayer statute, the Seventh Circuit rejected the argument that "intentional" requires criminal intent:

> As the district court properly reasoned, in analyzing the intent requirement of the Illinois slayer statute, "we do not consider criminal intent ('mens rea'), we consider civil intent. Civil intent only requires showing that a person intended his or her actions; there is no requirement that the person have knowledge that his or her actions were wrongful." *Laborers' Pension Fund v. Miscevic*, No. 1:16-cv-5865, 2017 WL 5904664, at *1 (N.D. Ill. Mar. 24, 2017); *accord Osman v. Osman*, 285 Va. 384, 737 S.E.2d 876, 880 (2013). Here, Anka intentionally stabbed Zeljko in his sleep and intentionally hit Zeljko in the head with a baseball bat to prevent him from calling the police. To be sure, like the killer in *Dougherty*, Anka was unable to appreciate the criminality of her conduct. But also like the killer in *Dougherty*, Anka intended her actions.

Miscevc, 880 F.3d at 936.

Wisconsin court of appeals decisions involving questions of insurance coverage have distinguished the words "criminal" and "intentional" in the context of an NGI adjudication. In American Strategic Ins. Corp. v. Curry, Appeal No. 2023AP861, 2024 WL 4297935, *2 (Wis. Ct. App. Sept. 26, 2024) (unpublished), an insurer denied coverage after the homeowner's son started a fire in the house. The insurance policy excluded losses caused directly or indirectly by "illegal or criminal acts." Id. Because the homeowner's son was adjudicated not guilty by reason of insanity, the homeowners argued that the

adjudication negated criminal intent. Id. The appellate court explained the NGI

pleas:

> In Wisconsin, a defendant is "not responsible for criminal conduct if
> at the time of such conduct as a result of mental disease or defect
> the person lacked substantial capacity either to appreciate the
> wrongfulness of his or her conduct or conform his or her conduct to
> the requirements of law." Wis. Stat. § 971.15(1). Accordingly, a
> defendant charged with a criminal offense may plead "[n]ot guilty by
> reason of mental disease or defect," or NGI, pursuant to Wis. Stat.
> § 971.06(1)(d), which is an affirmative defense to a criminal charge.
> Sec. 971.15(3).
> . . . .
>
> If the defendant enters a plea of "guilty" to the underlying crime and
> an NGI plea, as was the case here, the defendant "admits that but
> for the lack of mental capacity, the defendant committed all the
> essential elements of the offense charged." Id., ¶27 (quoting Wis.
> Stat. § 971.06(1)(d)). In this situation, the defendant is "found guilty
> of the elements of the crime(s) and the responsibility phase is left for
> trial." Id.

Id. at *5.

After clarifying that the responsibility phase is not a criminal proceeding,

the court of appeals equated the second phase to "something close to a civil

trial." Id. At the same time, the court distinguished a prior published appellate

decision in which a person's actions were still considered "intentional"—as

opposed to "criminal"—even though the person lacked the mental capacity to

govern his conduct. Id. at *7 (citing Wright v. Allstate Cas. Co., 331 Wis. 2d

754, 764 (Wis. Ct. App. 2011)).

In that earlier—published—decision in Wright, the Wisconsin Court of

Appeals determined that an "intentional acts exclusion" in a policy still applies

"even if such person lacks the mental capacity to govern his or her conduct."

Wright, 331 Wis. 2d at 757. The Wisconsin Court of Appeals emphasized that

29

although the insured was not subject to criminal penalties because of his mental illness, the "nature of the acts" did not change. Id. at 754. Because the insured had admitted that he intentionally shot and killed someone and was guilty of intentional homicide, the mental illness did not prevent him from intending his actions. Id.

This conclusion is supported by Wisconsin's Civil Jury Instruction 3100, "Insurance Contract: Misrepresentation or Breach of Affirmative Warranty by the Insured." That instruction advises the jury that "[t]o 'intend' means a present intention to do something." https://wilawlibrary.gov/jury/civil/ instruction.php?n=3100. As the Seventh Circuit held in Miscev, a person can have a present intent to kill someone, even if he can't appreciate the criminality of his actions. The court concludes that for the purposes of §854.14, it is not necessary for the killer to have the *criminal* intent to kill the insured for the killing to be "intentional."

Having determined that the "intent" required under §854.14 is a lesser standard than criminal intent, the court must decide whether, on this record, there is a genuine issue of fact as to whether the preponderance of the evidence shows that the defendant "intentionally" killed Dominique. The plaintiffs' proposed findings are uncontroverted and establish that the defendant acted with the purpose to kill. The deputy on the scene observed the defendant covered in blood as he dropped the knife and said, "All right, I am done now." Dkt. No. 80 at ¶¶7, 8. When he was taken into custody, the defendant said, "I

30

did it, I killed them." Id. at ¶15. At the hospital—unprompted—the defendant said:

> I killed my dog. He made the cutest little sound when I slit his throat. Then I killed my wife, I stabbed her in the back and I slit her throat. I think I cut her ear off too. I then busted through the door. I tried to get the kid but the kid got away from me and ran, that little fucker.

Id. at ¶15. The defendant did not dispute any of these proposed findings or point to evidence in the record that contradicts them; he simply wrote "Deny—Relevance to this Case." Dkt. No. 89 at ¶¶7-8, 15.

In the first phase of the state NGI proceedings, the defendant pled guilty to causing the death of Dominique and Deidre with a dangerous weapon. Dkt. No. 69-5 at 9-10. The following exchange took place on the record:

> THE COURT: All right. Count 1 states that on March 10, 2020, in the Town of Waukesha, Waukesha County, you caused the death of [Dominique] with intent to kill that person. This is a Class A felony, contrary to the statutory sections in the Complaint. It has a mandatory life sentence. In addition, based upon the use of a dangerous weapon, that being a knife, the term of imprisonment may be increased by an additional 5 years. Do you understand the charge and the potential penalties?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And are you prepared to enter a plea to that charge?
>
> THE DEFENDANT: Yes.
>
> THE COURT: What is that plea?
>
> THE DEFENDANT: Guilty.
>
> THE COURT: So you are admitting that on March 10, 2020, you caused the death of the individual known as [Dominique] with a dangerous weapon. Correct?
>
> THE DEFENDANT: Yes.

31

THE COURT: Count 2 states that on March 10, 2020, in the Town of Waukesha, Waukesha County, you caused the death of [Deidre] with intent to kill that person. This is a Class A felony, contrary to the statutory sections in the Complaint. Mandatory life imprisonment sentence. In addition, based upon the use of a dangerous weapon the Court may increase the sentence by an additional 5 years. Do you understand the charge and the potential penalties?

THE DEFENDANT: Yes.

THE COURT: Are you prepared to enter a plea?

THE DEFENDANT: Guilty.

THE COURT: So you are admitting that on March 10, 2020, in Waukesha County, you caused the death of [Deidre] with a dangerous weapon. Correct?

MR. WEITZNER: Judge, if I may interject here. I want to make sure that the record is abundantly clear that –

THE COURT: Use that microphone.

MR. WEITZNER: Sorry to interject, but I just want to make sure that the record is very clear here that these pleas are being entered pursuant to the agreement between the defense and the State as it relates to the NGI. And so this is kind of a fuzzy process, I guess we could call it, but in any event that Chapter 971, specifically 15, 971.165 and 971.17 all apply here.

THE COURT: And that is why I set forth my procedure. It was going to be somewhat similar to a standard plea and sentencing that we go through the Information, go to the plea questionnaire, and then we are going to go to the doctors' reports.

MR. WEITZNER: Thank you. That's all.

Dkt. No. 81-2 at 9-10. That record establishes the intent necessary under

§854.14.

The events that occurred during the second phase of the NGI

proceeding—the responsibility phase—are not inconsistent with a finding of

32

intent under §854.14. When committing the defendant to treatment, the Waukesha circuit court judge said:

> We have extremely violent crime that brought us here. We have first degree intentional homicide from the use of a knife. So, I mean, we are talking not even a detached type of criminal action. I mean, this is so intimate, so close, and [the defendant] took the life of his wife and his sister-in-law. Also there were two other individuals who were seriously injured, and the family dog that was killed.

Dkt. No. 81-3 at 25. Wis. Stat. §971.15(1) "states that a Defendant is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacked substantial capacity either to appreciate the *wrongfulness* of his or her conduct or conform his or her conduct to the requirements of the law." Again, as the Seventh Circuit reasoned in <u>Miscevic</u>, 880 F.3d at 935, the defendant could act with the purpose to kill and still lack the ability to understand the wrongfulness or criminality of what he was doing.

On this record, the court is satisfied that the defendant acted unlawfully and intentionally—with the purpose to kill his wife. Those actions bar his recovery under the Wis. Stat §854.14.

Although the court has made its ruling, it acknowledges that the plaintiffs also made an argument regarding Wisconsin's wrongful death statute, and the state court's decision to allow Dominique's parents to bring that claim. The court finds that argument confusing. It is possible that the plaintiffs meant to ask the court to apply the doctrine of issue preclusion (although that is not how they frame the argument). Under Wisconsin law, a court looking to apply issue preclusion considers whether "the question of law or fact that is sought

33

to be precluded [was] actually litigated" litigated in the previous action and necessary to the judgment. <u>Mrozek v. Intra Fin. Corp.</u>, 281 Wis. 2d 448 (Wis. 2005). If the issue was actually litigated and resolved by judgment, the court considers whether it would be fair to apply the doctrine. <u>Id.</u> at 464. For example, the court considers whether the defendant could have sought review, whether the question is one of law that involves two distinct claims or intervening contextual shifts in the law, whether significant differences between the two courts warrant relitigation of the issues, whether the burden of persuasion shifted such that there was a lower burden in the first trial, and whether matters of public policy would render the application of the doctrine fundamentally unfair. <u>Id.</u>

Although the wrongful death case in Waukesha County Circuit Court involved the same parties as this federal case, for the defendant to be found liable in the wrongful death case, the state court was required to find that the defendant caused the death, whether by "wrongful act, neglect or default." Wis. Stat. §895.03. Arguably proof that a person caused a death by a wrongful act, neglect or default requires proof of different elements than proof that a person unlawfully and intentionally killed another. The court cannot determine whether the plaintiffs are asking this federal court to find that causing a death by wrongful act, neglect or default is equivalent to an "unlawful and intentional" killing or whether the plaintiffs meant only to emphasize that the state court allowed Dominique's parents to bring the wrongful death claim, skipping over the defendant even though he took priority under the intestacy

34

statute. Either way, the plaintiffs have not met their burden in demonstrating that issue preclusion applies. But given the court's finding that the record evidence reveals no genuine issue of material fact as to whether the preponderance of the evidence shows that the defendant unlawfully and intentionally killed Dominique Roth, that fact is irrelevant.

## III. Conclusion

The court **GRANTS** the plaintiffs' motion for summary judgment. Dkt. No. 78.

The court **ORDERS** the Clerk of Court to release the Prudential Life Insurance Funds deposited with the court ($79,912.22 plus interest accrued) to the plaintiffs as soon as practicable.

The court **ORDERS** that this case is **DISMISSED.** The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 29th day of September, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

35